UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAVID VIENS,                          )   No. CV 15-8593-FFM
                                      )
                    Petitioner,       )   ORDER DENYING PETITION FOR
                                      )   WRIT OF HABEAS CORPUS
        v.                            )
                                      )
STUART SHERMAN,                       )
                                      )
                    Respondent.       )
_____)

## I. PROCEEDINGS

Petitioner, David Viens, a state prisoner in the custody of the California Department of Corrections, constructively filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 on November 3, 2015. On July 25, 2016, Respondent filed an Answer. On November 21, 2016, Petitioner filed a Reply. The parties have consented to have the undersigned conduct all proceedings in this case, including the resolution of all dispositive matters. The matter, thus, stands submitted and ready for decision.

/ / /

/ / /

/ / /

/ / /

## II.  PROCEDURAL HISTORY

A Los Angeles County Superior Court jury found Petitioner guilty of second degree murder (Cal. Penal Code § 187).  He was, thereafter, sentenced to fifteen years to life in state prison.

Petitioner then appealed his conviction.  On July 23, 2014, the California Court of Appeal filed an unpublished opinion in which it affirmed the judgment against Petitioner.  Petitioner then filed a petition for review in the California Supreme Court, which denied the petition on October 22, 2014.  Subsequently, Petitioner filed a series of state court collateral attacks to his conviction, the last of which was denied on July 15, 2015.

Petitioner then initiated this action.

## III.  FACTUAL BACKGROUND

The following facts were taken verbatim from the overview of the factual summary in the California Court of Appeal's opinion affirming Petitioner's conviction:[1]

    I.   *Prosecution Evidence*

        A.    *[Petitioner's] Relationship with His Wife*

        [Petitioner] was charged with the murder of his wife, Dawn Marie Viens, who was last seen alive on Sunday, October 18, 2009.   [Petitioner] and Dawn lived in a two-bedroom apartment in Lomita, California and had been together for over 15 years.  [Petitioner] was a

---

[1] The California Court of Appeal's opinion also contains a lengthy, exhaustive summary of the facts underlying Petitioner's conviction.  *See People v. Garcia*, 2009 WL 1315504, *1-19 (Cal. Ct. App. May 13, 2008).  Because of the length of that summary, only the court of appeal's "overview" of the facts is included in this Report.  Any reference to facts not included in the court of appeal's "overview" will be accompanied by a pinpoint citation to the court of appeal's opinion.

chef who owned his own restaurants, and he and Dawn generally worked together in the restaurants.  Friends and family described their relationship as a typical marriage.  They appeared to love one another and worked well together.  They argued at times, but always made up, and no one had witnessed [Petitioner] engage in physical violence against Dawn.

[Petitioner] had three children from a prior marriage, including a 19-year-old daughter, Jacqueline. Jacqueline was close to both her father and Dawn, and had lived with them for a period of time when she was a teenager.  As described by Jacqueline, both she and Dawn were heavy drinkers, and Dawn would drink alcohol throughout the day.  They occasionally drank alcohol together, and they also used drugs together from time to time.  When Jacqueline and her siblings were younger, [Petitioner] would joke with them that if he ever needed to get rid of a body, he would cook it.

In Spring 2009, [Petitioner] and Dawn opened a small restaurant in Lomita called the Thyme Contemporary Café.  The restaurant typically was open from Tuesday through Saturday, but was closed for a major remodeling between May and September 2009. During that time, [Petitioner] spent long hours working on the remodel while Dawn supported them financially by working as a waitress at another restaurant.  Once the Thyme Café was reopened, [Petitioner] worked as the

/ / /

3

chef in the kitchen while Dawn worked as the hostess and server.

Joe Cacace owned a motorcycle repair shop that was located in the same shopping center as the Thyme Café. Cacace had a friendly relationship with both [Petitioner] and Dawn and saw them at the restaurant on a daily basis. During the summer of 2009, Dawn gave Cacace an envelope with $640 in cash and asked him to hold it for her. She told Cacace that the money was a "nest egg" that she wanted to put aside for later.

Karen Patterson was an interior designer for restaurants and a close friend of [Petitioner] and Dawn for many years. In 2009, she worked with [Petitioner] on the remodel of the Thyme Café, and she saw the couple at the restaurant several times a week. During that summer, Patterson and Dawn became very close after Dawn's mother died of cancer. On one occasion in August 2009, Patterson observed red marks on Dawn's neck. When Patterson asked her about it, Dawn began crying and said that [Petitioner] had been drinking and tried to choke her. Dawn also said that [Petitioner] had been very angry with her and that there were other incidents when he had hurt her.

On another occasion in September 2009, Dawn called Patterson late one night and said that she had locked herself in the bathroom of her home. She told Patterson that [Petitioner] was angry with her and she was afraid that he was going to beat her. Patterson could

4

hear [Petitioner] pounding on the door and yelling, but
could not understand what he was saying.  Patterson
wanted to call the police, but Dawn asked her not to
because [Petitioner] could lose his restaurant.  Dawn
decided to wait in the locked bathroom until [Petitioner]
went to sleep.  Dawn called Patterson back a short time
later and said that [Petitioner] had gone to bed and she
would be okay.

B.     *Dawn's October 2009 Disappearance*

Donna Morton lived in the same apartment
complex as [Petitioner] and Dawn.  One afternoon in
October 2009, Morton overheard an argument between
them.  She could not hear what they were saying, but
their voices were both raised and it sounded like objects
were being thrown in their apartment.  After about 15
minutes, Dawn stormed out of the apartment; Morton
never saw her again.  When Morton later asked
[Petitioner] about Dawn, he said that they were no longer
together because Dawn did not want him to stay in the
restaurant business.  He also said that Dawn had a
drinking problem but did not want to get help, and she
had decided to go live in the mountains.

Richard Stagnitto was a friend of [Petitioner] and a
former business associate of [Petitioner's] family.  On
the evening of Sunday, October 18, 2009, Stagnitto went
to the Thyme Café to install a pot and pan rack in the
kitchen.  At about 10:00 p.m., after completing the
installation, Stagnitto sat down with [Petitioner] and

5

another man who was interviewing for a chef position. [Petitioner] complained that the restaurant was not working out the way he wanted and that Dawn was drinking too much and not doing her job as a hostess. He said that Dawn was a "sloppy mess" at work and that it was embarrassing to have her in the restaurant while he was trying to start the business. [Petitioner] was reviewing the restaurant receipts as he talked and became angry when the receipts did not balance. He said, "That bitch is stealing from me, and nobody steals from me, and I will kill that bitch." When Stagnitto tried to calm down [Petitioner] by suggesting that he send Dawn to rehab, [Petitioner] told him, "You're just a pussy." Shortly thereafter, [Petitioner] and the other man left to go to a club and Stagnitto went home.

At 11:01 p.m. that night, Dawn called Cacace on the telephone. She told him that she had some more money saved that she wanted to drop off at the motorcycle shop, and made plans to bring the money to Cacace the following day. Later that night, at 11:49 p.m., Dawn called Stagnitto. During their telephone conversation, Stagnitto told Dawn that [Petitioner] was upset with her and had accused her of stealing money from the restaurant. At that point, Dawn became very upset and began crying hysterically. Stagnitto and Dawn exchanged a few more telephone calls that night about where [Petitioner] was and how he would get home, but after those calls, Stagnitto did not hear from her again.

Dawn also never showed up at Cacace's motorcycle shop to drop off the money.

On the morning of Monday, October 19, 2009, [Petitioner] had a meeting with the employees at the Thyme Café. He appeared tired and upset, and told them that Dawn would no longer be working there and they needed to figure out a new management system to keep the restaurant running smoothly. He gave no reason for the change. One of the employees at the meeting was Kathy Galvan, who had been working as a part-time server at the restaurant for a few weeks. During the time that she worked with Dawn, Galvan observed that Dawn was moody, got easily upset, and yelled at the staff whenever there was an error with an order. At the meeting, [Petitioner] asked Galvan to take on some of Dawn's managerial duties, and as a result, Galvan began working at the restaurant on a full-time basis.

On Tuesday, October 20, 2009, Dawn was supposed to meet Patterson at the hospital where Patterson was undergoing treatment for cancer. When Dawn did not show up at the hospital or call, Patterson and her husband decided to stop by the restaurant to check on her. They did not find Dawn, but spoke with [Petitioner] who was not himself and appeared very agitated. As described by Patterson, [Petitioner] was drenched in sweat, seemed to be distraught, and had a large bandage on his hand. [Petitioner] told Patterson that he and Dawn had an argument because she refused

1    to go to rehab, and that she had left him.  [Petitioner]
2    also said that he recently had reviewed the restaurant
3    receipts and was concerned that Dawn had been taking
4    money from the business for some time.  At
5    [Petitioner's] request, Patterson reviewed a large pile of
6    receipts, but found only a small cash shortage of less
7    than $25.  Patterson asked [Petitioner] whether Dawn
8    had taken her belongings with her, and why her car was
9    still in the parking lot.  [Petitioner] said that Dawn had
10   taken some luggage but not her car because it was not
11   registered or working properly.  [Petitioner] was nervous
12   throughout their conversation, and appeared very
13   irritated by Patterson's questions.  At one point,
14   [Petitioner] said "good riddance" in reference to Dawn.

15          Three days later, on October 23, 2009, Patterson
16   again asked [Petitioner] about Dawn.  [Petitioner] said
17   that he had been communicating with Dawn via
18   telephone and text messages, and she had conveyed to
19   him that she needed time away.  Patterson asked
20   [Petitioner] to have Dawn call her directly because she
21   was very worried.  That same afternoon, Patterson
22   received a text message from Dawn's cell phone which
23   stated that she just needed some time to think.  The
24   message contained a number of spelling errors, which
25   was unusual for Dawn, and was signed "Love, Pixy."
26   Although Patterson's nickname for Dawn was "Pixie," it
27   was misspelled in the message as "Pixy."  Patterson later
28   received a second text message from Dawn's cell phone

which likewise contained many misspellings, including the nickname "Pixy."  The message stated that Dawn was moving back east and would provide a new phone number once she was settled.

Over the next several weeks, Patterson repeatedly tried to contact Dawn on her cell phone, but could not reach her.  On multiple occasions, Patterson asked [Petitioner] about Dawn's whereabouts, and he told her different stories about who Dawn might be with and what she might be doing.  Cacace also asked [Petitioner] about Dawn when he noticed she was missing, and [Petitioner] said that he had fired her because she was drinking on the job and making mistakes with money.  A week after Stagnitto last spoke with Dawn, he received a text message from her cell phone.  The message stated that Dawn was leaving town for awhile and needed to clear her head.  [Petitioner] later told Stagnitto that Dawn had refused to go to rehab and had left him.  About two weeks after Dawn disappeared, [Petitioner] and Galvan began a romantic relationship.  When Galvan first visited the Lomita apartment, she noticed that Dawn's belongings were still there and became concerned that Dawn might be coming back.  [Petitioner] assured Galvan that Dawn had left him and that their marriage was over.

In late October 2009, [Petitioner] called his daughter, Jacqueline, who was then living in South Carolina, and asked her to come to Lomita to help him

9

1    with the restaurant.  [Petitioner] made no mention of

2    Dawn at the time, but later told Jacqueline that Dawn

3    had taken off for a few days because they had a fight.

4    Jacqueline arrived in Lomita in early November 2009

5    and stayed for six weeks.  A day or two after her arrival,

6    [Petitioner] asked Jacqueline to pack up Dawn's clothes

7    and place them in storage because Dawn was not coming

8    back.  At [Petitioner's] request, Galvan came over to the

9    Lomita apartment and helped Jacqueline move Dawn's

10    clothes into a rental storage unit.  By mid-November

11    2009, Galvan had moved into the Lomita apartment with

12    [Petitioner].  [Petitioner] later showed both Galvan and

13    Jacqueline text messages that he claimed were from

14    Dawn and which stated that Dawn still loved [Petitioner]

15    but was leaving him.

16          One night in late 2009, [Petitioner] and Jacqueline

17    were driving home together from the restaurant.  They

18    were both drunk, and Jacqueline had smoked marijuana.

19    As he was driving, [Petitioner] began crying and

20    confessed to Jacqueline that Dawn was not coming back.

21    According to [Petitioner], he and Dawn had an argument

22    at their apartment one night.  [Petitioner] had taken a

23    sleeping pill and had asked Dawn to leave the room so

24    that he could sleep, but she kept badgering him and

25    trying to talk.  [Petitioner] moved a dresser in front of the

26    bedroom door to keep Dawn out, but she somehow got

27    back inside the room.  [Petitioner] then brought Dawn

28    into the living room, tied her up and restrained her

mouth, and returned to the bedroom to sleep.  When
[Petitioner] woke up the next morning, Dawn had died in
her own vomit.  [Petitioner] repeatedly told Jacqueline
that it was an accident.  He also said that Dawn's body
would never be found.  At [Petitioner's] request,
Jacqueline sent a text message to one of Dawn's friends
from Dawn's cell phone which stated that Dawn was
okay and was starting over in Florida.  After sending the
message, Jacqueline threw away Dawn's cell phone in an
attempt to protect her father.

C.     *The Missing Persons Investigation*

On November 8, 2009, Dawn's sister filed a
missing persons report with the Los Angeles County
Sheriff's Department.  Sheriff's Detective Tamar
Abraham led the missing persons investigation and took
numerous steps to locate Dawn, including distributing
flyers with her photograph to local law enforcement
agencies, reviewing her financial and cell phone records
for recent activity, interviewing her friends and family,
and updating a nationwide missing persons database with
her identifying information.  None of these actions
produced any leads.  At Detective Abraham's request,
Sheriff's Deputy James Dondis interviewed [Petitioner]
at his Lomita apartment on November 11, 2009.
[Petitioner] told Deputy Dondis that he and Dawn had
ongoing marital problems due to Dawn's drug and
alcohol abuse, and had argued in late October 2009
because Dawn was upset that [Petitioner] was working

so hard at the restaurant.  [Petitioner] said that Dawn left
the day after their argument and had not contacted him
since that time.  He also said that he did not report Dawn
as missing because he thought she was with her drug
friends and would return home when she was done.

On December 9, 2009, Detective Abraham
conducted a tape-recorded telephone interview with
[Petitioner] during which he said the following: Prior to
her disappearance, Dawn had been drinking 18 beers a
day, yelling at restaurant staff, and causing cash
shortages of $200 to $300 by miscalculating customer
bills.  On the night of October 18, 2009, [Petitioner] left
Dawn at home while he went to the restaurant and then
to a bar with a man he was interviewing for a chef
position.  When [Petitioner] returned home later that
night, Dawn was gone.  Dawn came home the following
week, wearing unclean clothes and smelling of alcohol.
She told [Petitioner] that she wanted them to leave the
restaurant business and live in the mountains.
[Petitioner] urged her to get help in a rehabilitation
program and Dawn ultimately agreed.  Two days later,
Dawn left again with some of her belongings.  Over the
next few weeks, [Petitioner] received several text
messages from Dawn and they spoke on the telephone
twice.  In one text message, Dawn said that she loved
[Petitioner] and needed time to work things out.

D.    *The Homicide Investigation*

In August 2010, after 10 months had passed

1 without any contact from Dawn, Detective Abraham

2 formed the opinion that Dawn had not left her home

3 voluntarily, and transferred the case to the sheriff's

4 department's homicide bureau.  Los Angeles County

5 Sheriff's Sergeant Richard Garcia led the homicide

6 investigation.  In October 2010, Sergeant Garcia

7 arranged for a search of the Lomita apartment, which

8 [Petitioner] and Galvan recently had vacated.

9 Bloodstains were found on the bedroom wall and

10 bathroom floor, but the samples were too degraded for

11 testing.  No other physical evidence was recovered from

12 the Lomita apartment.

13  On February 22, 2011, Jacqueline was contacted

14 by two Los Angeles County Sheriff's detectives as part

15 of the homicide investigation.  During an interview with

16 the detectives in South Carolina, Jacqueline disclosed

17 what [Petitioner] had told her about Dawn's death.  At

18 the detectives' request, Jacqueline then called

19 [Petitioner] and informed him that she had spoken to the

20 police about his prior confession.

21  On the morning of February 23, 2011, [Petitioner]

22 showed Galvan an article in the local newspaper which

23 indicated that Dawn's disappearance was now being

24 investigated as a homicide.  After reading the article,

25 [Petitioner] told Galvan that he was really sorry, but

26 Dawn was not coming back.  He also said that it was an

27 accident.  [Petitioner] and Galvan got into his car and he

28 drove them to nearby cliffs.  [Petitioner] was crying as he

drove and told Galvan he was going to jump.  A patrol car began following them and tried to initiate a traffic stop, but [Petitioner] sped away.  After stopping at a scenic overlook, [Petitioner] walked to the edge of the cliff followed by Galvan.  [Petitioner] again apologized to Galvan and said that no one was going to believe him and they were never going to be together after this.  He also said to tell his mother and his brother that he loved them very much.  [Petitioner] then jumped off the cliff. He was immediately rescued by a police helicopter and transported to the hospital, where he survived his injuries.

Following [Petitioner's] suicide attempt, Sergeant Garcia executed search warrants on [Petitioner's ] new residence, his mother's house, and the Thyme Café.  No physical evidence relating to Dawn's death was recovered during those searches.  However, a cadaver dog that was used during the search of the Thyme Café stopped at a shed and several other areas behind the restaurant.

E.    *[Petitioner's] Statements to the Police*

On March 1, 2011, Sergeant Garcia and his partner conducted a tape-recorded interview with [Petitioner] at the hospital.  [Petitioner] made the following statements during that interview: On October 18, 2009, Dawn wanted to use cocaine with [Petitioner].  He agreed, but found the experience was not enjoyable.  Later that night, [Petitioner] "got violent" because he had caught

14

Dawn stealing money from the business, and when he found her with the money, he "snapped." [Petitioner] placed duct tape around Dawn's mouth, feet, and hands, left her on the living room floor, and fell asleep. Dawn did not cry, scream, or resist [Petitioner] as he restrained her, and he did not recall seeing any blood. When [Petitioner] woke up the next morning, Dawn was dead. [Petitioner] initially put her body in the closet. He later put her body in a garbage bag that he placed in the dumpster behind the restaurant. [Petitioner] had duct-taped Dawn twice before because he "didn't want her driving around wasted, whacked out on coke, and drinking."

On March 15, 2011, at [Petitioner's] request, Sergeant Garcia and his partner conducted another tape-recorded interview with [Petitioner] at the jail hospital. [Petitioner] made the following statements during the second interview: Since the restaurant opening, [Petitioner] had been working 100 hours a week while Dawn was drinking and using cocaine. One Sunday morning, after reviewing the restaurant receipts, [Petitioner] realized a lot of money was missing, but thought it was due to Dawn making mistakes. Later that evening, Dawn went home while [Petitioner] went to the restaurant to help install a pot and pan rack in the kitchen. While at the restaurant, [Petitioner] met with a friend about a chef's position and they went out drinking at various bars and clubs. Dawn kept calling [Petitioner]

because she thought he was partying instead of coming home.  At some point, [Petitioner] spoke to Dawn on the telephone and she showed up at the bar and was "being difficult."  [Petitioner] decided to walk home while Dawn went to help his friend.  Once at home, [Petitioner] took an Ambien and moved a large bureau in front of the bedroom door to keep Dawn out.  After Dawn arrived home, she began "raising hell" outside the door and found a way inside the room.  [Petitioner] was lying down and feeling lightheaded from the Ambien when Dawn was suddenly "all over [him] and she's got the light on [his] face, calling [him] all kinds of mean names and stuff."  He kept telling her to leave him alone and let him sleep, but she would not listen.  [Petitioner] "grabb[ed]" Dawn by both hands, brought her into the leaving room, "forc[ed] her onto the floor," wrapped her hands and feet with duct tape, placed duct tape over her mouth, and then went to sleep.  When he awoke four hours later, Dawn was dead.

During the second interview, [Petitioner] also said the following about his disposal of Dawn's body: After realizing Dawn was dead, [Petitioner] came up with the idea of "cleaning the grease traps" in the restaurant and "comingling . . . the excess proteins in those units."  He placed Dawn's body in a large vat of boiling water and slowly cooked it for four days.  He then mixed her remains with grease and other debris from the restaurant and placed them in large garbage bags inside the

16

dumpster.  The only body part that [Petitioner] did not dispose of was Dawn's skull, which he hid in his mother's attic in case he wanted to leave it somewhere else.  [Petitioner] appeared to be in pain during the interview, but did not show signs of drowsiness or confusion.  Following the interview, law enforcement conducted a search of the attic in [Petitioner's] mother's house, but did not recover Dawn's skull or any other evidence relating to her death.  Dawn's remains were never found.

II.   *Defense Evidence*

Charlie Negrete was a chef who previously had worked with [Petitioner].  On the evening of October 18, 2009, Negrete met with [Petitioner] at the Thyme Café to discuss a chef position.  Negrete sat at a table and spoke briefly with [Petitioner] and another man, but he could not recall their conversation.  He did not remember [Petitioner] making any statements about Dawn.  Later that night, Negrete and [Petitioner] left the Thyme Café and went to a couple of bars where they both drank alcohol.  They then returned to the Thyme Café and went their separate ways.

Detective Abraham interviewed Patterson in November 2009.  Detective Abraham did not recall Patterson's exact words during the interview, but her report indicated that Patterson said that she had seen Dawn "strike" [Petitioner] in the past.  Patterson did not mention in the interview that she had seen bruises on

Dawn's neck or that Dawn had told her that [Petitioner] previously had choked her.  Patterson also did not mention that [Petitioner] had said "good riddance" in reference to Dawn.  Detective Abraham interviewed Stagnitto in December 2009. Stagnitto did not disclose in the interview that [Petitioner] had said "I'll kill that bitch" when talking about Dawn, or had made any statements about Dawn stealing.

Dr. Marvin Pietruszka was a forensic toxicologist and pathologist.  He testified that the drug Ambien could create a significant confused state in which the user might not be aware of his or her surroundings and might have a problem with alertness.  Other potential side effects of Ambien included drowsiness, light-headedness, fatigue, delusion, hallucination, tremors, and irritability.  Alcohol use while taking Ambien could aggravate these side effects and could cause the user to become irrational, experience memory loss, or develop delusions such as seeing or hearing things that did not exist.  Dr. Pietruszka reviewed [Petitioner's] medical records from March 2011 when he was hospitalized. [Petitioner] had been prescribed lorazepam, hydrocodone, morphine, and Benadryl.  The potential side effects of these drugs included drowsiness, sleepiness, weakness, confusion, altered memory, and difficulty performing daily activities.  The extent to which the user might experience these side effects would

/ / /

1  depend on the dosage, the user's metabolism, and the

2  combination of medications being used.

3  III.    *Verdict and Sentencing*

4          The trial court instructed the jury on first and

5  second degree murder, voluntary manslaughter, and

6  excusable homicide, but refused the defense request to

7  instruct the jury on involuntary manslaughter.  At the

8  prosecution's request, the trial court gave a special

9  pinpoint instruction that verbal provocation was

10  insufficient to reduce an intentional homicide to

11  manslaughter.  The jury found [Petitioner] guilty of

12  second degree murder, and the trial court sentenced him

13  to 15 years to life in state prison.

14  (Lodged Doc. No. 3 at 1-5.)

15

16                **IV.  PETITIONER'S CLAIMS**

17  1.    Trial counsel deprived Petitioner of his Sixth Amendment

18        right to effective assistance of counsel by committing the

19        following errors:

20        a.    failing to suppress Petitioner's pre-trial custodial

21              statements that were obtained when Petitioner was

22              hospitalized and was under the influence of numerous

23              medications;

24        b.    failing to call five available witnesses to testify in

25              Petitioner's defense;

26        c.    failing to adequately cross-examine three of the

27              prosecution's witnesses;

28        d.    failing to research and investigate how Petitioner's

                              19

combined use of Ambien, alcohol, and drugs may have
impacted his actions on the night that he killed his wife;

    e.    failing to call an appropriate expert witness to testify
about the effects of using Ambien;

    f.    failing to call a forensic psychiatrist to evaluate
Petitioner's "mental state and competency" in light of
the facts that Petitioner had attempted suicide, had used
prescription and non-prescription drugs, and had a
history of mental illness;

    g.    failing to pursue voluntary and involuntary intoxication
defenses, as well as failing to pursue an
unconsciousness defense, based on Petitioner's use of
Ambien, drugs, and alcohol; and

    h.    failing to adequately investigate facts to dispute the
specific intent and malice elements of second degree
murder.

2.    The prosecutor failed to present sufficient evidence to support
Petitioner's conviction for second degree murder.

3.    The trial court deprived Petitioner of his right to due process
and a fair trial by committing the following two instructional
errors:

    a.    misinstructing the jury on the concept of provocation as
that term applied to the crime of voluntary
manslaughter; and

    b.    failing to instruct the jury on the crime of involuntary
manslaughter, a lesser-included offense to the crime of
which Petitioner was convicted.

/ / /

20

# V.  STANDARD OF REVIEW

The standard of review applicable to Petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") (Pub. L. No. 104-132, 110 Stat. 1214 (1996)). *See* 28 U.S.C. § 2254(d); *see also Lindh v. Murphy*, 521 U.S. 320, 336, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997).  Under AEDPA, a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[2] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 402, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

The phrase "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."[3]  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  However, a state court need not cite the controlling Supreme Court cases in its own decision, "so long as neither the reasoning nor the result of the state-court decision contradicts" relevant Supreme Court precedent

---

[2] In addition, under 28 U.S.C. § 2254(e)(1), factual determinations by a state court "shall be presumed to be correct" unless the petitioner rebuts the presumption "by clear and convincing evidence."

[3] Under AEDPA, the only definitive source of clearly established federal law is set forth in a holding (as opposed to dicta) of the Supreme Court.  *See Williams*, 529 U.S. at 412; *see also Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004).  Thus, while circuit law may be "persuasive authority" in analyzing whether a state court decision was an unreasonable application of Supreme Court law, "only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

1   which may pertain to a particular claim for relief.  *Early v. Packer*, 537 U.S. 3, 8,

2   123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (*per curiam*).

3        A state court decision is "contrary to" clearly established federal law if the

4   decision applies a rule that contradicts the governing Supreme Court law or

5   reaches a result that differs from a result the Supreme Court reached on

6   "materially indistinguishable" facts.  *Williams*, 529 U.S. at 405-06.  A decision

7   involves an "unreasonable application" of federal law if "the state court identifies

8   the correct governing legal principle from [Supreme Court] decisions but

9   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

10  A federal habeas court may not overrule a state court decision based on the

11  federal court's independent determination that the state court's application of

12  governing law was incorrect, erroneous, or even "clear error."  *Lockyer*, 538 U.S.

13  at 75.  Rather, a decision may be rejected only if the state court's application of

14  Supreme Court law was "objectively unreasonable."  *Id.*

15       The standard of unreasonableness that applies in determining the

16  "unreasonable application" of federal law under Section 2254(d)(1) also applies

17  in determining the "unreasonable determination of facts in light of the evidence"

18  under Section 2254(d)(2).  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).

19  Accordingly, "a federal court may not second-guess a state court's fact-finding

20  process unless, after review of the state-court record, it determines that the state

21  court was not merely wrong, but actually unreasonable."  *Id.*

22       Where more than one state court has adjudicated the petitioner's claims, the

23  federal habeas court analyzes the last reasoned decision.  *Barker v. Fleming*, 423

24  F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803,

25  111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991) for presumption that later unexplained

26  orders, upholding judgment or rejecting same claim, rest upon same ground as the

27  prior order).  Thus, a federal habeas court looks through ambiguous or

28  unexplained state court decisions to the last reasoned decision in order to

1
2
3

determine whether that decision was contrary to or an unreasonable application of clearly established federal law.  *Bailey v. Rae*, 339 F.3d 1107, 1112-13 (9th Cir. 2003).

4

5

## VI.  DISCUSSION

6

### A.    Trial Counsel's Performance

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

In his first claim for relief, Petitioner contends that his trial counsel committed a host of errors that deprived Petitioner of his Sixth Amendment right to effective assistance of counsel.   The Los Angeles Superior Court denied Petitioner's allegations of attorney error on their merits.  In doing so, the superior court set forth and applied the proper federal legal standard governing ineffective assistance of counsel challenges.  (*See* Lodged Doc. No. 7.)  Accordingly, the superior court's resolution of Petitioner's claim was not contrary to the Supreme Court's clearly established precedent.  As such, the only avenue through which Petitioner can obtain habeas relief on his ineffective assistance of counsel allegations is by showing that the superior court's resolution of his claim constituted an "unreasonable application of" the Supreme Court's clearly established precedent -- that is, he must show that the superior court unreasonably applied the governing legal standard to the facts of his case.  *See Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001).  As explained below, Petitioner cannot make that showing.[4]

22

23
24
25
26
27
28

--------

[4] Respondent contends that this claim is unexhausted because, in rejecting the claim, the superior court cited several procedural deficiencies in Petitioner's state court petition, in addition to addressing the merits of Petitioner's ineffective assistance of counsel claim.   The Court, however, need not reach Respondent's exhaustion argument because, for the reasons set forth below, Petitioner's ineffective assistance of counsel allegations fail irrespective of whether the superior court's opinion is afforded AEDPA deference or not.  *See Berghuis v.*

(continued...)

1    Each of Petitioner's allegations of attorney error is governed by the two-

2    prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct.

3    2052, 80 L. Ed. 2d 674 (1984).  Under the first prong of that test, the petitioner

4    must prove that his attorney's representation fell below an objective standard of

5    reasonableness.  *Strickland*, 466 U.S. at 687-88, 690.  To establish deficient

6    performance, the petitioner must show his counsel "made errors so serious that

7    counsel was not functioning as the 'counsel' guaranteed the defendant by the

8    Sixth Amendment."  *Id.* at 687; *Williams*, 529 U.S. 362, 391, 120 S. Ct. 1495, 146

9    L. Ed. 2d 389 (2000).  In reviewing trial counsel's performance, however, courts

10   "strongly presume[] [that counsel] rendered adequate assistance and made all

11   significant decisions in the exercise of reasonable professional judgment."

12   *Strickland*, 466 U.S. at 690; *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1,

13   157 L. Ed. 2d 1 (2003).  Only if counsel's acts and omissions, examined within

14   the context of all the surrounding circumstances, were outside the "wide range"

15   of professionally competent assistance, will petitioner meet this initial burden.

16   *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305

17   (1986); *Strickland*, 466 U.S. at 690.

18       Under the second part of *Strickland*'s two-prong test, the petitioner must

19   show that he was prejudiced by demonstrating a reasonable probability that, but

20   for his counsel's errors, the result would have been different.  *Strickland*, 466

21   U.S. at 694.  The errors must not merely undermine confidence in the outcome of

22   the trial, but must result in a proceeding that was fundamentally unfair.  *Williams*,

23   529 U.S. at 393 n.17; *Lockhart*, 506 U.S. at 369.  The petitioner must prove both

24   _____

25   (...continued)
     *Tompkins*, 560 U.S. 370, 390, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) ("Courts
26   can, however, deny writs of habeas corpus under § 2254 by engaging in de novo
     review when it is unclear whether AEDPA deference applies, because a habeas
27   petitioner will not be entitled to a writ of habeas corpus if his or her claim is
     rejected on de novo review.") (citation omitted).
28

1   deficient performance and prejudice.  A court need not, however, determine
2   whether counsel's performance was deficient before determining whether the
3   petitioner suffered prejudice as the result of the alleged deficiencies.  *Strickland*,
4   466 U.S. at 697.

5       Here, Petitioner is not entitled to habeas relief with respect to any of his
6   allegations of attorney error.  Each of those allegations is addressed in turn below.

7           **1.      Petitioner's Pre-trial Custodial Statements**

8       Petitioner faults counsel for failing to suppress the statements that
9   Petitioner made in two interviews with police.  According to Petitioner, both of
10  his statements were involuntary because, when he made them, he was under the
11  influence of numerous medications and was recovering from numerous injuries
12  that he sustained from attempting suicide by jumping off a cliff.  Petitioner
13  maintains that, given his physical and mental state, he could not have validly
14  waived his right to remain silent.  Moreover, he suggests that his statements to
15  police were inherently unreliable because he made them while under the effects of
16  multiple medications and while enduring severe pain.  In support of this
17  argument, Petitioner cites what he characterizes as the inherent implausibility of
18  his custodial statement that he disposed of his wife's body by boiling it in a 55-
19  gallon vat for four days at the restaurant that he operated.  According to
20  Petitioner, doing so would have been impossible because of the weight involved
21  in moving the vat from the restaurant's kitchen to the outside dumpster.  Further,
22  he argues that such a scenario is even more implausible considering that the
23  restaurant was open for business during the relevant period.  Given these facts,
24  Petitioner believes that counsel should have been able to suppress Petitioner's
25  pre-trial statements and that counsel's failure to do so shows that counsel's
26  performance was unreasonable.

27      Petitioner can show neither deficient performance nor prejudice with
28  respect counsel's efforts to suppress Petitioner's pre-trial statements.  As an

initial matter, trial counsel moved to suppress Petitioner's pre-trial statements. And, in doing so, counsel argued, among other things, that Petitioner was not able to knowingly waive his rights because of his injuries and medications. Although Petitioner faults counsel for failing to present additional evidence, such as expert testimony, showing that Petitioner could not have knowingly waived his right to silence, there is no reason to believe that any such evidence would have altered the trial court's conclusions regarding the admissibility of Petitioner's pre-trial statements. The trial court listened to the audio tape of the interviews and concluded that Petitioner's waivers were valid. What is more, the trial court was well-aware of the potential side effects of the medications that Petitioner was taking when he submitted to the custodial interviews. Indeed, after denying the motion to suppress, the trial court conducted a hearing regarding the extent to which it would allow Petitioner's expert to testify about those side effects and how they may have impacted Petitioner. Ultimately, the trial court permitted the expert to testify generally about the side effects of the medications that Petitioner was using.

Moreover, the testimony regarding Petitioner's demeanor and behavior during the two interrogations undermines Petitioner's claims that he was incapable of knowingly waiving his right to silence. Indeed, the interrogating officer testified that Petitioner showed no signs of loss of memory, loss of orientation, or loss of cognitive function. The officer also noted that Petitioner's hospital bed confessions were consistent with his earlier accounts of how the victim died.[5] Although the officer noted that Petitioner was experiencing pain

---

[5] Notably, in terms of how the victim died, Petitioner's pre-trial statement to his daughter about his wife's death is nearly identical to the confession he gave to the interrogating officer. In each iteration of his accounts of his wife's death, he maintained that the death was accidental. He, likewise, told his girlfriend that he

(continued...)

and discomfort, the officer stated that Petitioner was not confused and did not appear drowsy.  Thus, there is no reason to believe that presenting expert testimony regarding Petitioner's state of mind would have caused the trial court to grant the motion to suppress Petitioner's pre-trial statements.[6]

Regardless, even assuming that counsel could have successfully suppressed Petitioner's hospital bed confessions, there is little reason to believe that the jury would have reached a verdict more favorable to Petitioner than the one it actually reached.  To be sure, "[a] confession is like no other evidence.  Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).  The impact of a confession can be so "profound" that a reviewing court may "'justifiably doubt [a jury's] ability to put [a confession] out of mind even if told to do so.'" *Id.*  But here, even if the hospital bed confessions had been suppressed, the jury nevertheless would have heard essentially the same confessions from other sources.  Indeed, before confessing to police that he killed his wife, Petitioner confessed the same facts to his daughter.  Although he did not tell his daughter the manner in which he disposed of his wife's body, he nevertheless made clear that, in fact, he had disposed of her body and that it would never be found.  What is more, he

/ / /

/ / /

/ / /

---

[5](...continued)
killed his wife by accident. Although Petitioner did not tell his daughter that he disposed of his wife's body by boiling it, he nevertheless assured his daughter that his wife's body would never be found.

[6] The Court also notes that Petitioner -- not the investigating officers -- initiated the second custodial interview.

confessed to his girlfriend that he had killed his wife and that he had not meant to do so.[7]

Moreover, apart from Petitioner's multiple confessions, there was strong and compelling evidence supporting the jury's verdict. Testimony established that Petitioner had motive to kill his wife because he believed that she was stealing money from the restaurant that he operated. And, on the night of the murder, he stated to a friend that he was going to kill his wife because she was stealing money. Additionally, after the murder, he devised and carried out an elaborate and prolonged scheme to cover-up his wife's murder. What is more, two weeks after his wife's death, Petitioner began a sexual relationship with a nineteen-year-old co-worker. Finally, when he believed that he would be arrested for his wife's murder, he fled from police and attempted suicide by jumping off a cliff. Given the weight of that evidence, there is little doubt that the jury would have found Petitioner guilty of second degree murder regardless of whether or not Petitioner's hospital bed confessions were admitted into evidence.

## 2.    Petitioner's Use of Ambien and Other Substances

Several of Petitioner's allegations of attorney error pertain to the purported fact that, on the night of the murder, he combined alcohol and drugs with the prescription drug Ambien. In each of those allegations, Petitioner essentially argues that his Ambien, alcohol, and drug use negated his ability to form the requisite intent to commit murder. Indeed, he argues that the impact of his Ambien, alcohol, and drug use rendered him either voluntarily or involuntarily intoxicated or even unconscious. Accordingly, Petitioner believes that counsel

---

[7] Notably, Petitioner statements in his custodial interviews, if believed, did not suggest that he intended to murder his wife. Instead, he maintained in those interviews -- as he did when confessing to his daughter and his girlfriend -- that his wife's death was accidental. Thus, the introduction of the custodial statements could not have been more prejudicial than Petitioner's statements to his daughter.

should have  -- but failed to -- conduct an adequate investigation into the effects of Petitioner's Ambien, alcohol, and drug use.  Had counsel done so, according to Petitioner, he could have presented competent expert testimony on the subject and pursued multiple viable defenses based on the impacts of Petitioner's Ambien, alcohol, and drug use.

Each of these allegations of attorney error is meritless.  First, counsel, in fact, presented an expert witness regarding the impacts of Ambien and alcohol use.  Specifically, Dr. Marvin Pietruszka, a forensic toxicologist and pathologist, testified that Ambien use could create a significant confused state in which the user might not be aware of his or her surroundings and might have a problem with alertness.  Dr. Pietruszka further testified that Ambien use could result in drowsiness, light-headedness, fatigue, delusion, hallucination, tremors, and irritability. What is more, Dr. Pietruszka explained that combining Ambien and alcohol could aggravate these side effects and could cause the user to become irrational, experience memory loss, or develop delusions, such as seeing or hearing things that did not exist.

Second, there is no reasonable likelihood that the jury would have accepted an argument that Petitioner was voluntarily or involuntarily intoxicated, or that he was unconscious, when he killed his wife.  Indeed, the only evidence supporting such a theory was Petitioner's own self-serving pre-trial custodial statements in which he claimed to have taken Ambien before he accidentally killed his wife. But even in those statements, Petitioner claimed to know what he was doing -- namely, he was, as he claimed to have done twice in the past, binding his wife with tape so that she would stop badgering him.  In other words, his own statements betray any argument that he was unaware of his actions.  Further, there is little reason to believe that the jury credited any exculpatory aspect of Petitioner's self-serving pre-trial statements in light of the evidence indicating that he murdered his wife.  According to the testimony at trial, Petitioner had

abused his wife in the past and, indeed, had choked her so hard that he left red marks on her neck.  Furthermore, on the night on which the murder occurred, Petitioner stated to a friend that he thought his wife was stealing from him and that he would "kill that bitch."  What is more, he told police the reason that he killed his wife -- namely, because he had caught her stealing money from the restaurant.  This discovery, according to Petitioner's pre-trial statement, made him "get violent" with her.  And, before claiming that he accidentally killed his wife, Petitioner continually lied to friends and police about his wife's whereabouts for months after her death.  Furthermore, he enlisted his own daughter to aid him in his deception.  Specifically, he instructed her to send texts purportedly from his wife to her friends stating that she needed time alone and that she was relocating to another state.  Petitioner also disposed of the victim's body so that it would never be -- and has never been -- recovered.  Given the extent and the prolonged nature of Petitioner's deception, as well as his stated motive for killing his wife, there is no reason to believe that the jury credited any aspect of Petitioner's custodial statements to the extent that those statements suggested that he accidentally killed his wife.

Third, any defense based on intoxication or unconsciousness was irreconcilable with Petitioner's pre-trial statements and with his actions after the murder.  Petitioner essentially told police that he decided to bind his wife, as he evidently had done in the past, in order to stop her from bothering him and to allow him to go to sleep.  He also explained that, in doing so, he did not intend to kill her and that he panicked when he realized that she had died.  In relaying this story, Petitioner stated exactly what he did and why he supposedly did it.[8]  In

---

[8] This account comported with the account that Petitioner gave to his daughter about how his wife had died.  In both accounts, Petitioner claimed to have moved a large bureau in front of his bedroom door to keep his wife out of the room.

(continued...)

other words, his actions were not those of someone who was either unconscious or too intoxicated to know what he was doing.  Moreover, after the murder, he disposed of his wife's body and engaged in a months-long elaborate scheme to convince his wife's friends that she was alive.  And, when he believed that police were going to arrest him for his wife's murder, he not only fled, but attempted suicide by jumping off a cliff.  Given these facts, there is no reasonable likelihood that the jury would have reached a more favorable verdict to Petitioner than the one it actually reached if counsel had pursued the proposed defenses or presented testimony from an additional forensic expert regarding Petitioner's mental sate.

Petitioner, however, suggests that the jury likely would have concluded that he was incapable of understanding his actions on the night of the murder (or that he accidentally killed his wife) if counsel had not prevented Petitioner from testifying.  This argument is also meritless.  When counsel informed the trial court that Petitioner would not be testifying, the trial court questioned Petitioner about his decision not to testify.  In doing so, the trial court unequivocally stated that the decision to testify or not was Petitioner's, and Petitioner's alone.  The trial court also asked Petitioner whether he wished to testify, and Petitioner answered that he did not wish to do so.  Based on this record, it is clear that counsel did not prevent Petitioner from testifying.  Rather, Petitioner, himself, elected not to testify.

To the extent that Petitioner disagrees with counsel's advice not to testify, that disagreement cannot justify habeas relief because it involves counsel's trial tactics.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Silva v. Woodford*, 279 F.3d 825, 844 (9th Cir. 2002) (noting

---

[8](...continued)
When that proved unsuccessful, he purportedly bound her with tape because she would not let him sleep.

1  United States Supreme Court precedent dictates that counsel commits no error

2  when counsel makes informed strategic decision) (citing *Burger v. Kemp*, 483

3  U.S. 776, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987)); *see also Carter v. Lee*, 283

4  F.3d 240, 249 (4th Cir. 2002) ("[T]he advice provided by a criminal defense

5  lawyer on whether his client should testify is 'a paradigm of the type of tactical

6  decision that cannot be challenged as evidence of ineffective assistance.'");

7  *United States v. Dyer*, 784 F.2d 812, 817 (7th Cir. 1986) (decision whether

8  defendant should testify is a "tactical choice of trial strategy" and is not subject to

9  review).

10       Moreover, counsel's decision to advise Petitioner against testifying was

11  sound under the circumstances.  Had Petitioner testified that he did not

12  understand his actions due to intoxication or unconsciousness, he would have

13  been impeached with his own pre-trial statements to police, which showed that, in

14  fact, he knew exactly what he was doing and why he did it.  Testifying also would

15  have allowed the prosecutor to question Petitioner about his criminal record,

16  which included two convictions for drug trafficking.  What is more, if Petitioner

17  had testified, he would have been forced to explain how he could have began a

18  sexual relationship with a nineteen-year-old co-worker only two weeks after

19  having purportedly killed his wife by accident.  Indeed, rather than strengthen his

20  defense, Petitioner's testimony in all likelihood would have weakened it and

21  could, in fact, have resulted in a conviction for first degree murder.  Accordingly,

22  counsel's advice that Petitioner not testify was sound.

### 3. Available Percipient Witnesses

24       In his next allegation of attorney error, Petitioner contends that counsel

25  erred in failing to call several available percipient witnesses who were willing to

26  / / /

27  / / /

28  / / /

32

1   testify on Petitioner's behalf.[9]  Specifically, Petitioner faults counsel for failing to

2   call Jose Mauro, Sandra Viens, Tim Gibbons, David Papin, and Charlie Negrete

3   as witnesses.  Each of the proposed witnesses, according to Petitioner, would

4   have testified in a manner that would have undermined the evidence that the

5   prosecutor presented to show Petitioner's guilt.

6       This claim fails because, at bottom, it amounts to a challenge to counsel's

7   strategic decision against calling the proposed witnesses to testify.  To be sure,

8   counsel was aware of each of the proposed witnesses, as the record shows that the

9   defense investigator interviewed each of the proposed witnesses.  (*See, e.g.*, Pet.

10  Attach. 4 at 2-3; *id.* at 37; *id.*, Attach. 6 at 56-58.)  Furthermore, the trial

11  transcript shows that counsel and Petitioner disagreed about which witnesses to

12  call.  For example, during a hearing on Petitioner's request to have substitute

13  counsel appointed, Petitioner informed the trial court that he wanted to call

14  certain witnesses to testify, but trial counsel was "adverse" to calling them.

15  Given this record, it is clear that counsel was aware of the proposed witnesses,

16  but elected not to call any of them for strategic reasons.  Because counsel made

17  an informed and strategic decision against calling the proposed witnesses, that

18  decision cannot be second-guessed on habeas review.  *Strickland*, 466 U.S. at

19  690; *Silva*, 279 F.3d at 844 (*supra*).

20      Moreover, even if the Court were inclined to second-guess counsel's

21  strategic decision against calling the proposed witnesses, Petitioner could not

22  make out a successful ineffective assistance of counsel claim based on counsel's

23  decision.  First, Petitioner can show no prejudice with respect to counsel's failure

24  to call Jose Mauro as a witness.  Petitioner contends that Mauro's testimony

25  would have shown that Petitioner did not dispose of his wife's body by boiling

26

27

28  _____

    [9] Petitioner also faults counsel for failing to call Petitioner to testify on his own
    behalf.  As explained above, that claim is meritless.  (*See supra*.)

1    her over a four-day period at his restaurant.  Mauro, an employee at Petitioner's

2    restaurant, would have testified that he never noticed the 55-gallon vat in which

3    Petitioner claimed to have boiled his wife.  This testimony, however, unlikely

4    would have impacted the jury's verdict because trial counsel introduced

5    photographic evidence of the restaurant to show the supposed implausibility of

6    Petitioner being able to boil his wife's body in a 55-gallon vat without any

7    employee or customer noticing.  And, even if the jury would have found Mauro's

8    testimony useful to undercut Petitioner's pre-trial statement about boiling his

9    wife's body, that testimony would not have changed the undisputed fact that

10   Petitioner successfully disposed of his wife's body after killing her.  Although

11   Mauro's testimony possibly could have called into question the manner in which

12   Petitioner disposed of the body, it would not have had any impact on the fact that

13   Petitioner indisputedly did so in a manner that prevented his wife's body from

14   ever being found.[10]

15       Second, Petitioner can show no prejudice from the fact that his mother,

16   Sandra Viens, did not testify.  Petitioner contends that Sandra's testimony would

17   have undercut the prosecution's theory that the murder was financially motivated

18   because Sandra, not Petitioner, owned the restaurant from which the victim was

19   allegedly stealing money.[11]  This contention is meritless because, by Petitioner's

20

21   _____

22   [10] Mauro also would have testified that he never saw Petitioner with a bandaged
     hand or a gash on his forehead after the victim was killed.  This testimony unlikely

23   would have impacted the jury's verdict because there is no question that Petitioner
     killed his wife and that he disposed of her body.   Furthermore, as explained

24   above, his actions after his wife's death indicate a consciousness of guilt.
     Consequently, Mauro's proposed testimony that Petitioner did not have a

25   bandaged hand or a gash on his forehead, even if believed by the jury, was
     unlikely to lead to jury to conclude that the killing was accidental.

26

27   [11] Petitioner also suggests that Sandra's testimony also could have shown that

28                                                                    (continued...)

own admission, he "got violent" because he had caught his wife stealing from the restaurant. Furthermore, on the night of the murder, Petitioner stated to a friend that "[t]hat bitch is stealing from me, and nobody steals from me, and I will kill that bitch." And, even after murdering his wife, Petitioner told one of his wife's closest friends that he believed that his wife had been taking money from the business for some time and, furthermore, requested that the friend review the restaurant's receipts. Given this evidence, Sandra's testimony would not have undermined the prosecution's theory of the case. Bolstering this conclusion is the fact that Sandra was Petitioner's mother and, as such, would have been subject to a credibility attack on that basis. *See Romero v. Tansy*, 46 F.3d 1024, 1030 (10th Cir. 1995) (testimony by defendant's family members is of "significantly less exculpatory value than the testimony of an objective witness"); *see also Bergman v. Tansy*, 65 F.3d 1372, 1380 (7th Cir. 1995) (counsel was not ineffective for failing to call family members who would have easily been impeached for bias).

Third, Petitioner suffered no prejudice from counsel's decision against calling Tim Gibbons as a witness. Petitioner contends that Gibbons could have testified that he saw Petitioner's wife hours before she was killed and that, contrary to Stagnitto's testimony, she was not crying, distraught, or hysterical. That testimony, however, was unlikely to have had any impact on the jury's verdict for several reasons. The fact that Gibbons was willing to testify that Petitioner's wife appeared, for all intents and purposes, normal and "causal" only undercuts Petitioner's claim that she was out of control when she arrived home a

---

[11](...continued)
Petitioner had access to Ambien, but was unaware of its side effects, and that there was no room in the restaurant's kitchen for Petitioner to boil his wife in a 55-gallon vat without being noticed. But as explained above, testimony on either of these points would not have impacted the jury's verdict because Petitioner, by his own admission, was aware of his actions and because, regardless of how he did so, Petitioner disposed of his wife's body after killing her.

short time later.  And, even if the jury accepted Gibbons's account of the victim's demeanor over that of Stagnitto, the jury in all likelihood would have reached the same verdict because Petitioner repeatedly admitted that he killed his wife and nothing in Gibbons's declaration suggests that her death was accidental.  Furthermore, as discussed above, Petitioner's prolonged, elaborate efforts to cover-up his wife's murder evidenced a consciousness of guilt.

Fourth, Petitioner can show neither prejudice nor deficient performance with respect to counsel's decision against calling David Papin, the victim's brother, to testify.[12]  According to Petitioner, Papin would have testified that he did not believe that Petitioner would harm his wife.  But any testimony regarding Papin's beliefs as to Petitioner's guilt would have been inadmissible because, under California law, "[a] witness may not express an opinion on a defendant's guilt."  *People v. Coffman*, 34 Cal. 4th 1, 77, 7 Cal. Rptr. 3d 710, 196 P.3d 30(2011).  Moreover, although Papin purportedly would have testified that the victim abused drugs and alcohol, that testimony would have been cumulative of other testimony.  More importantly, counsel may have concluded that Papin's testimony might actually have been detrimental to Petitioner's defense.  Indeed, the benefit -- if any -- of Papin's testimony may have been overshadowed by the fact that he described Petitioner as a "control freak" and by the fact that he characterized Petitioner and his wife's relationship as a "time bomb."  That testimony could have made the jury more inclined than it already was to conclude that the murder was intentional.  Accordingly, Petitioner cannot show that the

/ / /

---

[12] This aspect of Petitioner's claim fails for lack of evidence because Petitioner provides nothing in the form of a declaration or affidavit from Papin stating that Papin was willing to testify or identifying the facts to which he would have testified. *See Dows*, 211 F.3d at 486 (*supra*).  Instead, Petitioner relies on a memorandum created by a defense investigator summarizing a purported interview between the investigator and Papin.

1   decision against calling Papin to testify was unreasonable or that, if it was,

2   Petitioner suffered any prejudice.

3       In short, none of the proposed testimony cited by Petitioner likely would

4   have caused the jury to believe that the murder was unintentional.  Moreover,

5   Petitioner's statements before the murder and his actions after the murder

6   undermine any suggestion that the murder was anything but intentional.

7   Accordingly, Petitioner cannot show that, but for counsel's failure to introduce

8   the proposed testimony, the jury would have reached a verdict more favorable to

9   Petitioner than the one it actually reached.

10      **4.     Examination of Witnesses**

11      In his next allegation of attorney error, Petitioner contends that counsel

12  failed to adequately examine three witnesses.  First, he asserts that counsel's

13  questioning of Barbara Dryer was inadequate because Dyer was willing to testify

14  that she gave Petitioner several Ambien pills without alerting him to the side

15  effects of the drug.  Presumably, Petitioner believes that Dyer's proposed

16  testimony would have shown that he did not intend to kill the victim because the

17  effects of taking the Ambien given to him by Dyer rendered him either

18  involuntarily intoxicated or unconscious.

19      Second, Petitioner faults counsel for counsel's allegedly deficient cross-

20  examination of Kathy Galvan, the woman with whom Petitioner become

21  romantically involved two weeks after killing his wife.  Specifically, Petitioner

22  maintains that counsel should have questioned Galvan about whether she noticed

23  a 55-gallon vat at Petitioner's restaurant -- the vat in which he allegedly boiled

24  his wife's body for four days.  According to a declaration that Petitioner

25  submitted in connection with his Petition, Galvan would have testified that she

26  saw no such vat and that, given the space constraints on the restaurant, both the

27  restaurant's employees and its customers would have noticed if Petitioner had

28  used such a large vat.  Petitioner also notes that Galvan was willing to testify that,

contrary to the testimony of a prosecution witness, Petitioner did not have either a gash on his forehead or a bandage on his hand after killing his wife. In addition, Petitioner asserts that Galvan could have testified that Petitioner told her that he was taking Ambien and using drugs and alcohol on the night that he killed his wife. Furthermore, Petitioner faults counsel for failing to question Galvan about the statements Petitioner made to her about his wife's death. In particular, Galvan could have testified that Petitioner told her that he accidentally killed his wife and that he never placed tape over his wife's nose, nor did he in any way obstruct her breathing.

Finally, Petitioner contends that counsel failed to adequately cross-examination Petitioner's daughter, Jacqueline Viens. According to a declaration that Petitioner has submitted, Jacqueline was willing to testify that Petitioner's pre-trial statement to her that his wife's body would never be found was taken out of context. In truth, according to the declaration, Petitioner stated that his wife's body would never be found because too much time had elapsed from the date on which she was killed. Jacqueline further declares that Petitioner told her that he had been taking Ambien on the night that he killed his wife and that it impacted his judgment and behavior. In addition, Jacqueline was willing to testify that the victim was a regular drug user and that she had no fear of Petitioner. Jacqueline was also willing to testify that Petitioner had told her that, on the night that he killed his wife, he never covered her nose with tape and that he steadfastly maintained that his wife's death was accidental.

None of these allegations of attorney error warrants relief. First, counsel could not have performed deficiently in failing to question Dryer about whether she gave Petitioner Ambien pills because, in fact, counsel attempted to question Dryer on that issue. Dryer, however, invoked her Fifth Amendment right against self-incrimination. Although Petitioner presumably faults counsel for failing to push Dryer to waive her right against self-incrimination, there is no evidence

suggesting that, in fact, Dryer would have done so at counsel's urging. Regardless, as explained above, any defense theory based on Petitioner's inability to understand the nature of his actions due to his Ambien use had no chance of success in light of Petitioner's repeated claims that he knew what he was doing, and why, when he purportedly decided to bind his wife in duct tape.

Second, assuming error, Petitioner suffered no prejudice from counsel's purportedly inadequate examination of Galvan. Galvan's proposed testimony pertaining to the 55-gallon vat -- or lack thereof -- at the restaurant was unlikely to have impacted the jury's verdict because, as explained above, trial counsel presented evidence to undermine Petitioner's pre-trial statement about boiling his wife's body at the restaurant. Further, Galvan's proposed testimony, like that of Mauro (*supra*), would not have changed the undisputed fact that Petitioner disposed of his wife's body after killing her. Galvan's proposed testimony that she did not notice any injuries to Petitioner's hand and forehead, likewise, was unlikely to have had any impact on the jury's verdict in light of Petitioner's pre-trial statement that he wanted to kill his wife, his elaborate actions after the murder to cover up his wife's death, and the undisputed facts that he killed his wife and disposed of her body. As for Galvan's proposed testimony regarding Petitioner's Ambien use, that testimony would not have had any impact at trial because Petitioner's repeated pre-trial confessions show that, on the night of the murder, he was aware of his actions.[13] And, given the fact that Petitioner engaged in a months-long scheme of deception after his wife's murder, there is little reason to believe that the jury would have credited his post-murder statements

/ / /

/ / /

---

[13] The Court also notes that Petitioner's pre-trial statement to police, which was played to the jury, included the supposed fact that Petitioner had taken Ambien on the night that he killed his wife.

1  about the circumstances surrounding his wife's death to the extent that those

2  statements in any way exonerated him.[14]

3       Finally, assuming error, Petitioner suffered no prejudice from counsel's

4  purportedly inadequate examination of Petitioner's daughter Jacqueline.

5  Jacqueline's declaration shows that she was willing to testify to facts that, by and

6  large, were either cumulative of other evidence or unlikely to have altered the

7  jury's verdict.  For example, she states that she was willing to testify about the

8  victim's drug use and Petitioner's purported use of Ambien on the night of the

9  murder.  But evidence was presented on the victim's drug use, and, as explained

10  above, testimony regarding Petitioner's Ambien use would not have impacted the

11  jury's verdict.  (*Supra*.)

12       Moreover, Jacqueline's proposed testimony about the details of Petitioner's

13  account of the murder was unlikely to have impacted the jury's verdict.  At

14  bottom, Petitioner appears to believe that Jacqueline's testimony that Petitioner

15  never admitted to covering, or obstructing, his wife's nose with tape would have

16  bolstered his claim that her death was accidental.  But that belief is unfounded

17  because Jacqueline testified that Petitioner told her that he accidentally killed his

18  wife by binding her with duct tape.  Petitioner also provided his version of the

19  details of the victim's death to police.  In both accounts, Petitioner claimed to

20  have put duct tape over the victim's mouth, not intending to kill her, but to quiet

21  her.   In other words, the jury understood that, time and time again, Petitioner

22  claimed that he did not intend to murder his wife.  Accordingly, there is no reason

23  to conclude that Jacqueline's proposed testimony would have made the jury any

24  _____

25    [14] For this reason, there is also no merit to Petitioner's claim that counsel erred in

26  failing to question Galvan about Petitioner's pre-trial description of the events
surrounding his wife's death.  Moreover, the Court notes that Galvan's proposed

27  account of Petitioners's pre-trial statements was not materially different from
Jacqueline's account of Petitioner's pre-trial statements or from Petitioner's pre-

28  trial statement to police.

more or less likely than it already was to accept Petitioner's claim that he accidentally killed his wife.

There is also no reason to believe that Jacqueline's proposed testimony regarding Petitioner's statement about his wife's body not being found would have had any impact on the jury's verdict. Any testimony offered by Jacqueline suggesting that Petitioner unintentionally killed his wife necessarily was suspect because Jacqueline was Petitioner's daughter and because she aided Petitioner in covering up the fact that he killed his wife. *See Romero*, 46 F.3d at 1030; *Bergman*, 65 F.3d at 1380 (*supra*). Regardless, even if Jacqueline would have testified that Petitioner was referring to the amount of time that had passed since his wife's death when stating that her body never would be found, the fact remains that Petitioner -- and Petitioner alone -- killed his wife and disposed of her body in one way or another. Thus, Jacqueline's proposed testimony was unlikely to have benefitted Petitioner in any meaningful way.

In sum, none of Petitioner's allegations of attorney error warrant habeas relief.[15]

## B.   Sufficiency of the Evidence

In his second claim for relief, Petitioner contends that the prosecution failed to present sufficient evidence to prove that he harbored the requisite malice to support a second degree murder conviction. According to Petitioner, the prosecution was factually bound by its presentation of his custodial statements to police. Petitioner notes that, in those statements, which were admitted over his objections, he stated that he did not intend to kill his wife. Moreover, Petitioner

---

[15] Petitioner also contends that the state courts erred in failing to conduct an evidentiary hearing as to his allegations of attorney error. This contention is meritless, as the existing record leaves no doubt that Petitioner suffered no cognizable prejudice from any of his allegations of attorney error. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012) (evidentiary hearing not required where existing record shows that habeas relief is unwarranted).

1  notes that no evidence was presented to contradict his description of how his wife

2  died.  Accordingly, Petitioner believes that the prosecution could not argue that

3  his custodial statements were false.  The California Court of Appeal rejected this

4  claim on its merits.  As explained below, the court of appeal did not commit

5  constitutional error in doing so.

6      Habeas relief is unavailable on a sufficiency of the evidence challenge

7  unless "no rational trier of fact could have agreed with the jury." *Cavasos v.*

8  *Smith*, __ U.S. __, 132 S. Ct. 2, 181 L. Ed. 2d 311 (2011) (*per curiam*); *Jackson*

9  *v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  All

10  evidence must be considered in the light most favorable to the prosecution.

11  *Jackson*, 443 U.S. at 319.  Accordingly, if the facts support conflicting inferences,

12  reviewing courts "must presume – even if it does not affirmatively appear in the

13  record – that the trier of fact resolved any such conflicts in favor of the

14  prosecution, and must defer to that resolution."  *Id.* at 326; *Bruce v. Terhune*, 376

15  F.3d 950, 957 (9th Cir. 2004) (*per curiam*); *Turner v. Calderon*, 281 F.3d 851,

16  882 (9th Cir. 2002).  Furthermore, under AEDPA, federal courts must "apply the

17  standards of *Jackson* with an additional layer of deference."  *Juan H. v. Allen*,

18  408 F.3d 1262, 1274 (9th Cir. 2005).

19      Furthermore, circumstantial evidence and inferences drawn from it may be

20  sufficient to sustain a conviction.  *See Jones v. Wood*, 207 F.3d 557, 563 (9th Cir.

21  2000) (finding sufficient evidence for murder conviction where "evidence was

22  almost entirely circumstantial and relatively weak").  The reviewing court must

23  respect the exclusive province of the factfinder to determine the credibility of

24  witnesses, resolve evidentiary conflicts, and draw reasonable inferences from

25  proven facts.  *See United States v. Goode*, 814 F.2d 1353, 1355 (9th Cir. 1987).

26      The jury convicted Petitioner of second degree murder.  In California,

27  murder is the unlawful killing of a human being "with malice aforethought."

28  CAL. PENAL CODE § 187(a).  The malice necessary to support a murder charge

1   may be express or implied. CAL. PENAL CODE § 188. "It is express when there is

2   manifested a deliberate intention unlawfully to take away the life of a fellow

3   creature." (*Id.*) It is implied when an unprovoked killing "results from an

4   intentional act, the natural consequences of which are dangerous to human life,

5   and the act is deliberately performed with knowledge of the danger to, and with

6   conscious disregard for, human life." *People v. Cook*, 39 Cal. 4th 566, 596, 47

7   Cal. Rptr. 3d 22, 139 P.3d 492 (2006).

8        Here, there was ample evidence supporting the jury's verdict. Indeed, on

9   the very night on which he killed his wife, Petitioner announced to a friend that

10  he was going to kill his wife because he believed that she was stealing money

11  from the restaurant that he operated. Although Petitioner notes that, at the time,

12  his friend did not take Petitioner's statements seriously, the jury reasonably could

13  have inferred otherwise, considering that Petitioner, in fact, killed his wife later

14  that night. What is more, testimony established that Petitioner had violently

15  abused his wife in the months leading up to the murder. Indeed, Petitioner tried

16  to choke his wife, so much so that he left red marks on her neck. And, when she

17  was asked about the incident, the victim confided to a friend that it was not the

18  first time that Petitioner had hurt her. Approximately one month before the

19  murder, the victim locked herself in a bathroom because she feared Petitioner was

20  going to beat her. A friend who called the victim while the latter was locked in

21  the bathroom testified that she could hear Petitioner yelling and pounding on the

22  door.

23       Furthermore, Petitioner's actions after the murder evidence a consciousness

24  of guilt. After killing his wife, Petitioner disposed of her body. Although

25  Petitioner maintains that he could not have, as he told police, boiled her body in

26  his restaurant, that fact is inconsequential because, one way or another, he

27  disposed of her body in a manner that prevented her body from ever being found.

28  Two days after the murder, when asked about his wife, Petitioner replied, "Good

riddance to her." He also devised an elaborate scheme to cover up his wife's death. Indeed, he misled his friends and family and, later, lied to police about his wife's disappearance. What is more, within two weeks of killing his wife, Petitioner began a romantic relationship with a nineteen-year-old co-worker, who shortly thereafter moved in with Petitioner. And, when confronted by the fact that police believed that he had killed his wife, he fled and attempted suicide by jumping off a cliff. Having considered those actions, coupled with the evidence of Petitioner's stated motive to kill his wife, the jury reasonably could have found that, in fact, he intentionally murdered his wife.

Finally, there is no merit to Petitioner's argument that, under California law, the prosecution was bound by the facts to which Petitioner admitted in his custodial interviews. As the California Court of Appeal noted in rejecting this argument, California law permitted the prosecutor to impeach Petitioner's custodial statements because there was other competent and substantial evidence establishing Petitioner's guilt. This Court is bound by the state court of appeal's interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (*per curiam*) (stating that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Furthermore, as the court of appeal noted, Petitioner, himself, was responsible for the lack of direct evidence showing that the murder was intentional. Indeed, Petitioner disposed of the victim's body so that no testing of any kind could be performed on the body.[16]

---

[16] Petitioner argues that there was evidence adduced at trial showing that he lacked the requisite malice aforethought to kill his wife. For example, he notes that he told police that he was using Ambien and drugs on the night in question. He also notes that he told police that he did not intend to kill his wife. Furthermore, he points to testimony suggesting that, despite their stormy relationship, he and his wife were in love. At bottom, however, Petitioner's

(continued...)

44

1    In sum, the court of appeal reasonably concluded that there was sufficient

2    evidence to show that the murder was intentional and that Petitioner harbored the

3    requisite malice to commit second degree murder.

4          **C.    Jury Instruction on Provocation**

5          In his next claim for relief, Petitioner contends that the trial court violated

6    his right to due process and a fair trial by erroneously instructing the jury on the

7    concept of provocation as it relates to the crime of voluntary manslaughter.

8          The following background is relevant to this claim for relief.  At trial, the

9    parties agreed that, in addition to being instructed on the crimes of first and

10   second degree murder, the jury would be instructed on the lesser included offense

11   of voluntary manslaughter.  Under California law, voluntary manslaughter is the

12   "unlawful killing of a human being without malice . . . upon a sudden quarrel or

13   heat of passion."  Cal. Penal Code § 192(a).  A conviction for voluntary

14   manslaughter is appropriate if the victim has provoked the defendant in a manner

15   causing "'the reason of the accused [to be] obscured or disturbed by passion to

16   such an extent as would cause the ordinarily reasonable person of average

17   disposition to act rashly and without deliberation and reflection, and from such

18   passion rather than from judgment.'"  *People v. Barton*, 12 Cal. 4th 186, 201, 47

19   Cal. Rptr. 2d 569, 906 P.2d 531 (1995).

20   / / /

21

22   _____

23   [16](...continued)

24   argument is nothing more than an invitation to re-weigh the evidence at trial and
     intrude upon the jury's exclusive province to determine whether or not Petitioner

25   acted with the requisite malice aforethought to murder his wife.  Although the
     evidence might have supported the inferences advanced by Petitioner, it also

26   supported the reasonable inference that Petitioner intentionally killed his wife.
     Because the evidence at trial supported that conclusion, Petitioner cannot show

27   that the prosecutor failed to introduce sufficient evidence to support the jury's

28   verdict.

1    Over Petitioner's objection, the trial court instructed the jury as follows

2  with respect to the concept of provocation:  "Words or gestures, no matter how

3  grievous or insulting, are not sufficient provocation to reduce an intentional

4  homicide to manslaughter. Name calling, alone, even if intimidating, is not

5  sufficient provocation to reduce an intentional homicide to manslaughter."

6  (Lodged Doc. No. 7 at 11.)

7    According to Petitioner, that instruction was erroneous because, under

8  California law, words and gestures can provide the requisite provocation to

9  reduce murder to manslaughter.  Moreover, Petitioner maintains that the

10  instruction effectively directed the jury to find that the there was no provocation

11  underlying the murder of which Petitioner was accused.

12    The California Court of Appeal rejected this claim on its merits.  In doing

13  so, the court of appeal acknowledged that the challenged instruction misstated the

14  law on provocation because it was overbroad.  According to the court of appeal,

15  there may be narrow circumstances where verbal conduct can constitute legally

16  adequate provocation for voluntary manslaughter.  The court of appeal explained

17  that, generally, those narrow circumstances were limited to repeated sexual taunts

18  or admissions of infidelity by an unfaithful spouse.  By contrast, according to

19  court of appeal, "adequate provocation for voluntary manslaughter cannot be

20  shown 'where the act that allegedly provoked the killing was no more than

21  taunting words, a technical battery, or slight touching.'" (*Id.* at 8.)

22    Notwithstanding the fact that the challenged instruction was overbroad, the

23  court of appeal concluded that Petitioner suffered no prejudice because the

24  victim's alleged conduct was insufficient to constitute verbal provocation as a

25  matter of law.  In so concluding, the court of appeal reviewed Petitioner's pre-

26  trial accounts of the victim's actions before Petitioner purportedly bound her with

27  duct tape.  Those accounts, according to court of appeal, showed that the victim,

28  at most, was "raising hell outside the door" and then "calling [Petitioner] all kinds

1   of mean names and stuff" once she was in the room with Petitioner.  (*Id.* at 9-10.)

2   The court of appeal reasoned that the victim's purported actions could not have

3   "rise[n] to the level of verbal provocation required for voluntary manslaughter or

4   excusable homicide," and, thus, Petitioner suffered no prejudice as a result of the

5   challenged instruction.  (*Id.* at 10.)  Specifically, the court of appeal stated:

6           Although verbal provocation in the abstract may be

7           sufficient to reduce an intentional homicide from murder

8           to manslaughter, there was no evidence in this case that

9           [the victim] said any words or made any gestures that

10          could lead a reasonable jury to find that [Petitioner]

11          killed her in a heat of passion based on adequate

12          provocation.  Therefore, the special instruction did not

13          remove from the jury's consideration any evidence of

14          words or gestures by [the victim] that could have

15          supported a voluntary manslaughter conviction or an

16          acquittal based on excusable homicide.  Under these

17          circumstances, the error in giving the instruction did not

18          contribute to the jury's verdict, nor is it reasonably

19          probable that [Petitioner] would have obtained a

20          favorable result if the instruction had not been given.

21  (*Id.*)  Consequently, the court of appeal rejected Petitioner's instructional error

22  claim.  As explained below, the court of appeal did not commit constitutional

23  error in so doing.

24          Where a habeas claim rests on an alleged constitutional error arising from a

25  jury instruction, the question is whether the alleged instructional error "by itself

26  so infected the entire trial that the resulting conviction violates due process."

27  *Estelle v. McGuire*, 502 U.S. 62, 70-71, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)

28  (citing *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368

1    (1973)).  The challenged instruction "may not be judged in artificial isolation, but
2    must be viewed in the context of the overall charge."  *Cupp*, 414 U.S. at 146-147.
3    "If the charge as a whole is ambiguous, the question is whether there is a
4    reasonable likelihood that the jury has applied the challenged instruction in a way
5    that violates the Constitution."  *Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.
6    Ct. 1830, 158 L. Ed. 2d 701 (2004) (per curiam) (citations and internal quotation
7    marks omitted).  Moreover, even if instructional error is found to rise to the level
8    of a constitutional violation under this standard, federal habeas relief is
9    unavailable unless "the error, in the whole context of the particular case, had a
10   substantial and injurious effect or influence on the jury's verdict."  *Calderon v.*
11   *Coleman*, 525 U.S. 141, 147, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998) (citing
12   *Brecht*, 507 U.S. at 637).

13        Here, the court of appeal reasonably rejected Petitioner's challenge to the
14   provocation instruction.  First, as the court of appeal's opinion makes clear,
15   nothing that the victim purportedly said or did before Petitioner allegedly bound
16   her with duct tape constituted sufficient provocation under California law to
17   support a finding that that Petitioner killed her in the heat of passion.  The court
18   of appeal's interpretation of California law is binding on this Court.  *See*
19   *Bradshaw*, 546 U.S. at 76 (*supra*).

20        Second, even assuming that the victim's actions could have supported a
21   finding of provocation, there is no reason to believe that the jury, in fact, would
22   have found that Petitioner committed voluntary manslaughter, as opposed to
23   second degree murder, if the trial court had properly instructed the jury on
24   provocation.  Because the court of appeal assumed that error occurred but
25   rejected the claim on harmlessness grounds, this claim effectively has become one
26   asserting that the court of appeal's rejection itself was contrary to, or an
27   unreasonable application of, the Supreme Court's harmless-error doctrine.
28   / / /

On direct review, reversal is required if the prosecution fails to show that the error "was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The *Chapman* standard, however, is less forgiving to trial errors than the harmless error standard applicable on federal habeas review. *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) ("Review for harmless error under [the harmless error standard applicable on federal habeas review] is 'more forgiving' to state court errors than the harmless error standard that the Supreme Court applies on its direct review of state court convictions."). On federal habeas review, a constitutional trial error justifies habeas relief only if the error had a substantial and injurious impact in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011) (holding that *Brecht* test should be applied regardless of whether state court found error harmless under state's harmless error test).

Under AEDPA, reviewing courts "accord deference to a state court's harmlessness determination." *Garcia v. Long*, 808 F.3d 771, 781 (9th Cir. 2015). Nevertheless, "[b]ecause it is more stringent, the *Brecht* test 'subsumes' the AEDPA/*Chapman* standard for review of a state court determination of the harmlessness of a constitutional violation." *Mays v. Clark*, 807 F.3d 968, 980 (9th Cir. 2015) (citing *Fry v. Pliler*, 551 U.S. 112, 120, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007)). "A determination that the error resulted in 'actual prejudice' [under *Brecht*] necessarily means that the state court's harmlessness determination was not merely incorrect, but objectively unreasonable." *Id.* (citations omitted). As such, "[a] separate AEDPA/*Chapman* determination is not required." *Id.* Notwithstanding that fact, reviewing courts apply *Brecht* "with due consideration of the state court's reasons for concluding that the error was harmless beyond a reasonable doubt." *Garcia*, 808 F.3d at 771.

/ / /

1       Here, the court of appeal reasonably concluded that Petitioner suffered no

2   prejudice from any infirmity in the challenged provocation instruction.  At most,

3   the victim "raised hell" when Petitioner refused to unlock his bedroom door and,

4   thereafter, insulted him once he unlocked the door.  No reasonable juror would

5   conclude that such actions would cause an ordinarily reasonable person of

6   average disposition to rashly and without deliberation and reflection take the

7   actions that Petitioner claims to have taken.  Indeed, in response to being insulted,

8   Petitioner claimed to have bound the victim's arms, legs, and mouth with tape and

9   left her unattended for hours.  And, Petitioner's repeated pre-trial statements

10  betray any argument that he killed his wife in the heat of passion.  Indeed, he

11  consistently maintained that he bound his wife with duct tape so that she would

12  leave him alone.

13      Moreover, in order to accept Petitioner's voluntary manslaughter theory,

14  the jury would have had to have believed Petitioner's account of his wife's

15  actions.  That premise is highly unlikely considering that, for months after he

16  killed his wife, Petitioner went to great lengths to lie to anyone who asked him

17  about his wife's disappearance.  Given this fact, there is little reason to believe

18  that the jury would have credited Petitioner's story to the extent that it suggested

19  that his wife provoked his purported response.

20      Finally, Petitioner's voluntary manslaughter theory was unlikely to succeed

21  given the weight of the evidence showing that Petitioner murdered his wife.

22  Indeed, only hours before killing his wife, Petitioner had threatened to kill her

23  because he believed that she was stealing from the restaurant that he operated.

24  Petitioner's actions after the murder also render it highly unlikely that the jury

25  believed Petitioner's pre-trial accounts of the events leading to his wife's death, at

26  least to the extent that those accounts suggested that Petitioner did not act with

27  malice aforethought.  After all, Petitioner repeatedly lied about his wife's

28  whereabouts, disposed of her body, sent fake text messages to her friends to

convince them that she was alive, initiated a sexual relationship with another woman within two weeks of killing his wife, and ultimately fled from authorities and attempted suicide when confronted by police.  Given the overwhelming weight of this evidence, it is doubtful that the jury would have believed that Petitioner acted in the heat of passion when he killed his wife -- let alone that her act of insulting him was sufficiently provocative to cause him to take the actions that he claimed to have taken.

In short, the court of appeal reasonably concluded that Petitioner suffered no prejudice from the trial court's erroneous provocation instruction. Accordingly, the court of appeal's rejection of this claim was neither an unreasonable application of, nor contrary to, clearly established federal law as determined by the Supreme Court.

### D.   Involuntary Manslaughter

In his final claim for relief, Petitioner contends that the trial court deprived him of his right to due process and a fair trial by refusing to instruct the jury on involuntary manslaughter, a lesser included offense to the crime of second degree murder.  According to Petitioner, an involuntary manslaughter instruction was warranted because California permits an individual to be found guilty of involuntary manslaughter if the individual kills another without malice during the commission of a non-inherently dangerous felony.  Citing this law, Petitioner maintains that the facts of his case supported an involuntary manslaughter conviction because, based on his pre-trial statements, he accidentally killed his wife while committing false imprisonment.  Petitioner maintains that false imprisonment is not an inherently dangerous felony.  As such, he believes that, under California law, he was entitled to an involuntary manslaughter instruction.

This claim fails for several reasons.  First, it is not cognizable on habeas review.  "Under the law of [the Ninth Circuit], the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a

51

1    federal constitutional question." *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th

2    Cir. 1998); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).  Accordingly,

3    Petitioner cannot obtain habeas relief on either of these claims.

4       Second, even if the claims were cognizable, they nevertheless would fail.

5    The United States Supreme Court has never held that a trial court's failure to

6    instruct on a lesser included offense in a non-capital case violates due process of

7    law.  Rather, the Supreme Court has held only that a defendant has a

8    constitutional right to have the jury instructed on lesser included offenses in

9    capital cases.  *Beck v. Alabama*, 447 U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d

10    392 (1980).  In so holding, the Supreme Court expressly declined to state whether

11    that right extended to non-capital cases.  *Id*. at 638 n.14; *see also Gilmore v.*

12    *Taylor*, 508 U.S. 333, 361-62, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993)

13    (Blackmun, J., *dissenting*) (observing that *Beck* left open question of whether due

14    process entitles criminal defendants in non-capital cases to have jury instructed

15    on lesser included offenses).  Therefore, the state court decision cannot be said to

16    be contrary to, or an unreasonable application of, federal law as decided by the

17    Supreme Court.  *See Carey v. Musladin*, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L.

18    Ed. 2d 482 (2006) (where Supreme Court precedent gives no clear answer to

19    question presented, "it cannot be said that the state court 'unreasonab[ly]

20    appli[ed] clearly established Federal law'").

21       Finally, Petitioner's challenge to the trial court's refusal to instruct the jury

22    on involuntary manslaughter fails because, as the court of appeal explained,

23    Petitioner had no right under California law to the proposed instruction.

24    Petitioner maintains that he was entitled to an involuntary manslaughter

25    instruction because his pre-trial statements, if believed, showed that the victim

26    died while Petitioner was committing the crime of false imprisonment, which is

27    not an inherently dangerous felony.  But, as the court of appeal explained, "in

28    deciding whether an involuntary manslaughter instruction was warranted in this

case, the relevant inquiry is not whether [Petitioner's] predicate felony of false imprisonment was dangerous in the abstract, but whether it was dangerous under the circumstances of its commission." (Lodged Doc. No. 7 at 11.)  Because, according to the court of appeal, Petitioner's false imprisonment of his wife was dangerous under the circumstances of its commission, Petitioner was not entitled to an involuntary manslaughter instruction under California law.  This Court is bound by the court of appeal's interpretation of California law.  *See Bradshaw*, 546 U.S. at 76 (*supra*).

For the foregoing reasons, Petitioner is not entitled to habeas relief with respect to his challenge to the trial court's refusal to instruct the jury on involuntary manslaughter.

## VII.  ORDER

The Magistrate Judge, therefore, orders that judgment be entered denying the Petition on the merits with prejudice.

DATED: January 31, 2016

                                    /S/ FREDERICK F. MUMM
                                    FREDERICK F. MUMM
                                    United States Magistrate Judge